United States Court of Appeals,

Fifth Circuit.

No. 95-31178.

CAUSEWAY MEDICAL SUITE;  Hope Medical Group for Women, on behalf of themselves and the patients they serve, Plaintiffs- Appellees,

v.

Richard P. IEYOUB, Attorney General of the State of Louisiana, Michael J. Foster, Jr., Governor, State of Louisiana, Bobby P. Jindal, Secretary of the Louisiana Department of Health and Hospitals, and Madlyn B. Bagneris, Secretary of the Louisiana Department of Social Services, Defendants-Appellants.

April 14, 1997.

Appeal from the United States District Court for the Eastern District of Louisiana.

Before POLITZ, Chief Judge, and EMILIO M. GARZA and STEWART, Circuit Judges.

STEWART, Circuit Judge:

We must decide whether certain provisions of Act 1254 (codified at La. R.S. 40:1299.35.5 (West Supp.1996)), which changed Louisiana's judicial bypass procedure for minors seeking abortions, comports with the Due Process Clause of the Fourteenth Amendment.  We hold that it does not and affirm the district court's summary judgment which permanently enjoined La. R.S. 40:1299.35.5(B).

LEGISLATIVE BACKGROUND

In Louisiana, minors under the age of eighteen must obtain the consent of at least one parent or legal guardian before a physician has the legal authority to perform an abortion.  La. R.S. 40:1299.35.5(A) (West 1992).  However, a physician may perform the abortion without the consent of a parent or legal guardian if t he minor exercises her rights under a judicial bypass procedure prescribed in La. R.S. 40:1299.35.5(B).  Section 1299.35.5(B) has, since 1978, undergone changes.  Because this appeal largely turns on the 1995 changes to § 1299.35.5(B), we bel ieve that a brief review of the legislative history of § 1299.35.5(B) sheds valuable light on the issues before us.

*A. The 1978 Version of La. R.S. 40:1299.35.5(B)*

We begin in 1978, when the Louisiana Legislature enacted La. R.S. 40:1299.35.5 (the 1978

Act), which, among other things, regulated the circumstances under which minors could obtain abortions. Notably, the 1978 Act, while providing for a judicial bypass, gave little (if any) guidance to courts faced with minors seeking abortions. Subsection (A) of the 1978 Act, titled "Notice and consent," provided that the parents or legal guardian of a minor under eighteen must receive actual notice twenty-four hours before the minor had an abortion or, if the parent or legal guardian could not be reached, that parent or legal guardian must receive constructive notice seventy-two hours before the abortion. The sole exception to these parental notification requirements was a bare-bones judicial bypass provision, which stated simply "unless the abortion is ordered by a court having jurisdiction over such minor pregnant woman." Subsection (B) provided that if the minor was under the age of fifteen, she must obtain informed, written consent from a parent or legal guardian or "obtain[ ] an order from a court having jurisdiction over her that the abortion be performed or induced." Neither subsection (A) nor (B) provided any criteria that must be met before a judge could, without any notice to the parent(s) or legal guardian(s), order a minor to have an abortion.

Then, in 1979, the Supreme Court handed down *Bellotti v. Baird,* 443 U.S. 622, 99 S.Ct. 3035, 61 L.Ed.2d 797 (1979) (*Bellotti II* ), in which a plurality of the Court set forth the standards that should govern the judicial bypass procedure for minors seeking abortions. Recognizing the parent-child tension that may accompany a minor's wish to have an abortion, the Court held that a minor may seek an order from a court, without the consent or notification of a parent or legal guardian, that authorizes the procedure. *Id.* at 646-48, 99 S.Ct. at 3049-51. In particular, the Court held:

> If she satisfies the court that she is mature and well enough informed to make intelligently the abortion decision on her own, the court *must* authorize her to act without parental consultation or consent. If she fails to satisfy the court that she is competent to make this decision independently, she must be permitted to show that an abortion nevertheless would be in her best interests. If the court is persuaded that it is, the court *must* authorize the abortion.

*Id.* at 647-48, 99 S.Ct. at 3050 (emphasis added). Approximately eight months after *Bellotti II* was decided, Louisiana's skeletal judicial bypass provision was struck down as inconsistent with *Bellotti II.* In *Margaret S. v. Edwards,* 488 F.Supp. 181, 203 (E.D.La.1980) (*Margaret S.(I)* ), the district court held: "This section [§ 1299.35.5(B) ] says nothing more than the pregnant minor may receive

an order from a "court having jurisdiction over her that the abortion be performed or induced.' This is not enough.... La.Rev.Stat.Ann. § 40:1299.35.5(B) sets forth no standards or guidelines for the minor seeking judicial approval for abortion."

*B. The 1980 and 1981 Versions of La. R.S. 40:1299.35.5(B)*

In 1980, the Louisiana Legislature responded to *Margaret S.(I)* and, among other things, changed La. R.S. 40:1299.35.5(B) to comply with *Bellotti II*. Most importantly for purposes of this appeal, the new statute contained the mandatory language from the *Bellotti II* decision. La. R.S. 40:1299.35.5(B) provided in part: "The court *shall* authorize the abortion only if the court finds that the woman is sufficiently mature and well-informed to make an intelligent decision on her own concerning the abortion, or, if the court finds that regardless of the capacity of the woman to make the decision, the abortion would be in her best interest." (Emphasis added). The 1980 version also included an expediency clause: "Such applications shall be heard summarily *and expeditiously* and shall take precedence over matters on the docket of the court." (Emphasis added).

In 1981, Louisiana modified its abortion statute, beginning with a general statement of legislative intent. Section 1299.35.0 (West 1992) provided in part: "It is the intention of the Legislature of the State of Louisiana to regulate abortion to the extent permitted by decisions of the United States Supreme Court." In 1981, the legislature also refined and expanded § 1299.35.5(B), and the pertinent sections read as follows:

> (3) Each application shall be heard in chambers, confidentially, in a summary manner, and within forty-eight hours of the filing thereof.
>
> (4) If the court finds that the minor is sufficiently mature and well enough informed to make the decision concerning the abortion on her own, the court *shall* issue an order authorizing the minor to act on the matter without parental consultation or consent.
>
> (5) If the court finds that the minor is not competent to make the decision concerning the abortion on her own, but finds that the abortion nevertheless would be in the best interest of the minor, the court *shall* issue an order authorizing the abortion.

(Emphasis added). Subsections (4) and (5) parsed out the "maturity and well-informed" provision and the "best-interests-of-the-minor" inquiry. As with the 1980 version, the 1981 version of § 1299.35.5(B) retained the mandatory "shall" language. However, the word "expeditiously" was removed and a forty-eight hour time frame for hearing a minor's application was imposed. With these

new changes in place, § 1299.35.5(B) survived a constitutional attack the next time around. *See Margaret S. v. Treen,* 597 F.Supp. 636, 650-52 (E.D.La.1984) (*Margaret S. (II)* ), *aff'd on other grounds sub nom. Margaret S. v. Edwards,* 794 F.2d 994 (5th Cir.1986).[1]

*C. Act 1254—The 1995 Version of La. R.S. 40:1299.35.5(B)*

And so it was for fourteen years. In 1995, however, the Louisiana Legislature went back to the drawing board with Act 1254, which expanded and changed § 1299.35.5(B) to read in part:

> (3) Each application shall be heard in chambers, anonymously, in a summary manner, and within forty-eight hours of the filing thereof.
>
> (4) If the court finds, by clear and convincing evidence, that the minor is sufficiently mature and well enough informed to make the decision concerning the abortion on her own, the court *may* issue an order authorizing the minor to act on the matter. Prior to any such order, the court may require the minor to participate in an evaluation and counseling session with a mental health professional from the Department of Health and Hospitals, office of mental health, and a staff member from the Department of Social Services, office of community services. The court may refer the petitioner, if necessary, to the appropriate Department of Health and Hospitals, office of mental health regional office to arrange the evaluation and counseling session within forty-eight hours of the ex parte hearing, excluding legal holidays.
>
> (5) If the court finds that the minor is not sufficiently mature and well enough informed to make a decision intelligently among the alternatives, the court shall decide whether or not it would be in the best interest of the minor to notify her parents or guardian of the proceedings. *If the court finds that it is in the minor's best interest to notify her parents or guardian, the court shall so notify* and reconvene the proceedings within forty-eight hours with the parents or guardian present to advise and counsel the minor and aid the court in making its determination whether or not the abortion would be in the best interest of the minor.
>
> (6) If the court finds that the minor is not competent to make the decision concerning the abortion or that it would not be in the minor's best interest to notify her parents or guardian, the court *may* issue an order authorizing the abortion if the court finds, by clear and convincing evidence, that the abortion would be in the best interest of the minor.

(Emphasis added). Three changes to Louisiana's bypass procedure are relevant for purposes of this appeal:[2] (1) in subsections (4) and (6) (which correspond to subsections (4) and (5), respectively,

---

[1] The district court in *Margaret S. (II)* stated that the 1981 judicial bypass procedure provided for an "expeditious hearing of the matter...." 597 F.Supp. at 652. As we have noted, however, the word "expeditious[ ]" was removed from the 1981 statute. The district court did not consider the meaning of "summary manner" as defined under Louisiana law to determine whether the new subsection (3) met the *Bellotti II* expedition requirement.

[2] Although the plaintiffs challenged and the district court enjoined the expediency provision in subsection (3), that subpart largely remained unchanged in Act 1254. The legislature only changed "confidentially" to "anonymously." This particular change has not been challenged by the plaintiffs.

in the 1981 statute), "shall" has been changed to "may," so that if the juvenile court finds that a minor is mature and well-informed or that an abortion would be in the minor's best interest, the court now "may" order an abortion; (2) subsection (4) permits judges to refer a minor to a state-sponsored counseling and evaluation session within forty-eight hours of the ex parte hearing; and (3) subsection (5) states that a juvenile court judge is compelled to notify the parents or guardian of an immature minor if doing so is in the best interest of the minor.

PROCEDURAL HISTORY

On July 6, 1995, Causeway Medical Suite and Hope Medical Group for Women (plaintiffs) filed suit challenging the constitutionality of Act 1254. The plaintiffs sought injunctive relief, claiming that Act 1254 violated the Due Process Clause of the Fourteenth Amendment because Act 1254 (1) provided juvenile court judges discretion to deny a minor an abortion even though the minor demonstrated that she was mature and well-informed or that the abortion would be in her best interest; (2) failed to establish a time limit for an expeditious resolution of the minor's bypass application; (3) allowed the juvenile court to refer minors to state-sponsored evaluation and counseling without providing any time frame within which counselors are to report back to the court, thereby depriving minors of an effective opportunity to obtain an abortion and preventing the minor from remaining anonymous; and (4) breached the minor's confidentiality by permitting the juvenile court to notify the minor's parent that she is seeking an abortion if the court finds such notification would be in the minor's best interest.

With one exception,[3] the district court agreed with the plaintiffs on each of these points. 905 F.Supp. 360, 364-66 (E.D.La.1995). Accordingly, the district court entered summary judgment, permanently enjoining Act 1254 because it "constitute[d] an undue burden on the right of minors to have access to abortion services by way of a judicial bypass of the parental consent requirement and thus violates the Due Process clause of the Fourteenth Amendment." *Id.* at 366. This appeal

---

[3]The district court did not rule on the plaintiff's claim that the state-sponsored counseling provision impermissibly breached anonymity. On appeal, the plaintiffs resurrect this argument. We decline to address this claim, however, because it is unnecessary to the disposition of this case. The counseling and evaluation provision is facially unconstitutional for another reason discussed in Part IV.A.2, *infra.*

followed.

## DISCUSSION

The State makes three claims on appeal. First, it claims that the plaintiffs do not have standing to bring this lawsuit because there is no "case or controversy ." Second, the State argues that the proper standard of proof for facial challenges requires plaintiffs to demonstrate that Act 1254, under no set of circumstances, is constitutional. Third, and central to this appeal, the State contends that each of the challenged provisions is facially constitutional. We reject each of these contentions.

## I. STANDARD OF REVIEW

We review the district court's decision to permanently enjoin Act 1254 for an abuse of discretion. *North Alamo Water Supply Corp. v. City of San Juan,* 90 F.3d 910, 916 (5th Cir.1996). "The district court abuses it s discretion if it (1) relies on clearly erroneous factual findings when deciding to grant or deny the permanent injunction, (2) relies on erroneous conclusions of law when deciding to grant or deny the permanent injunction, or (3) misapplies the factual or legal conclusions when fashioning its injunctive relief." *Id.* at 916-17. " "The standard of review over the district court's grant of a permanent injunction must, of course, be segmented according to the component functions performed by the district court.' " *Peaches Entertainment Corp. v. Entertainment Repertoire Assocs., Inc.,* 62 F.3d 690, 693 (5th Cir.1995) (quoting *Multnomah Legal Serv. Workers Union v. Legal Serv. Corp.,* 936 F.2d 1547, 1552 (9th Cir.1991)).

This case comes to us from a grant of summary judgment in favor of the plaintiffs. We review *de novo* the district court's entry of summary judgment. *TLI, Inc. v. United States,* 100 F.3d 424, 425 (5th Cir.1996).

## II. JURISDICTION AND STANDING

The State suggests that there is no "case or controversy" because the state officials named in this lawsuit do not have "the power to enforce private-action court procedures." As such, the State concludes, the injunction in this case is "hypothetical and meaningless." We reject these claims. The plaintiffs in this case have standing to assert the claims of those minors who seek abortions by way of a judicial bypass. *See Planned Parenthood of Southeastern, Pa. v. Casey,* 505 U.S. 833, 842-45,

112 S.Ct. 2791, 2803, 120 L.Ed.2d 674 (1992). And the district court had jurisdiction pursuant to 28 U.S.C. § 1343 because the plaintiffs seek redress for a deprivation of a constitutional right under color of state law.

III. THE STANDARD OF PROOF FOR FACIAL CHALLENGES TO ABORTION STATUTES

The plaintiffs in this case have brought a facial challenge, claiming that Act 1254 on its face violates the Due Process Clause of the Fourteenth Amendment. The Supreme Court has articulated two approaches to proving a statute is facially unconstitutional. In *United States v. Salerno,* 481 U.S. 739, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987), the Court held that in a facial challenge, "the challenger must establish that *no set of circumstances* exists under which the Act would be valid." *Id.* at 745, 107 S.Ct. at 2100 (emphasis added). However, in *Planned Parenthood of Southeastern Pa. v. Casey,* 505 U.S. 833, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992), the Court appeared to temper the *Salerno* standard by suggesting that an abortion law is facially invalid if "*in a large fraction of the cases in which [the law] is relevant,* it will operate as a substantial obstacle to a woman's choice to undergo an abortion." *Id.* at 895, 112 S.Ct. at 2830 (emphasis added). Plainly, more statutes will survive a facial attack under *Salerno* than under *Casey.*

Shortly after *Casey* was decided, we held in *Barnes v. Moore,* 970 F.2d 12, 14 n. 2 (5th Cir.), *cert. denied,* 506 U.S. 1021, 113 S.Ct. 656, 121 L.Ed.2d 582 (1992), that *Casey* did not overrule *Salerno.* Since our decision in *Barnes,* however, no clear consensus among federal courts has emerged regarding the standard for facial challenges in a post-*Casey* world. Six Justices from the Supreme Court have expressed their views on this issue, but not in cases receiving a full hearing by the Court. Justices O'Connor, Souter, and Stevens have made it clear that the *Casey* standard controls in the abortion context. *See Janklow v. Planned Parenthood, Sioux Falls Clinic,* --- U.S. ----, ----, 116 S.Ct. 1582, 1583, 134 L.Ed.2d 679 (1996) (Stevens, J., mem. respecting denial of certiorari) ("While a facial challenge may be more difficult to mount than an as-applied challenge, the dicta in *Salerno* "does not accurately characterize the standard for deciding facial challenges,' and "neither accurately reflects the Court's practice with respect to facial challenges, nor is it consistent with a wide array of legal principles.' ")(quoting Michael C. Dorf, *Facial Challenges to State and*

*Federal Statutes,* 46 STAN. L. REV. 235, 236, 238 (1994)); *Fargo Women's Health Organization v. Schafer,* 507 U.S. 1013, 1014, 113 S.Ct. 1668, 1669, 123 L.Ed.2d 285 (1993) (O'Connor, J., joined by Souter, J., conc. in denial of stay pending appeal) (stating that lower courts' application of *Salerno* standard "is inconsistent with *Casey* "). On the other hand, Chief Justice Rehnquist and Justices Scalia and Thomas have stated that the *Salerno* standard applies in the abortion context. *See Janklow,* --- U.S. at ---- - ----, 116 S.Ct. at 1584-87 (Scalia, J., joined by Rehnquist, C.J. & Thomas, J., dissenting from denial of certiorari). There is also considerable disagreement among the lower federal courts on this issue.[4] *See generally* Ruth Burdick, Note, *The* Casey *Undue Burden Standard: Problems Predicted and Encountered, and the Split Over the* Salerno *Test,* 23 HASTINGS CONST. L.Q. 825 (1996) (arguing that lower federal courts are likely to remain split over the *Salerno-Casey* choice).

The district court avoided this thicket of disagreement, reasoning that under either approach, Act 1254 was unconstitutional. 905 F.Supp. at 363 n. 2. As such, the district court applied the more rigorous *Salerno* standard. *Id.* at 363. In this appeal, both parties urge us to confront head-on the question of the standard of proof that should govern facial challenges in abortion cases. Specifically, the plaintiffs claim that the statements made by Justices O'Connor and Souter in *Fargo Women's Health Organization v. Schafer,* 507 U.S. at 1014, 113 S.Ct. at 1669, and by Justice Stevens in *Janklow* call into doubt our prior holding in *Barnes.* On the other hand, the State asks us to follow our previous decision in *Barnes* because the Supreme Court has not conclusively resolved the confusion in this area.

We are free to reconsider the correctness of a panel opinion, short of the full court sitting en banc, if the Supreme Court has handed down an intervening decision that implicitly or explicitly overrules one of our prior decisions. *See Federal Deposit Ins. Corp. v. Dawson,* 4 F.3d 1303, 1307

---

[4]*Compare Compassion in Dying v. Washington,* 79 F.3d 790, 798 n. 9 (9th Cir.1996) (en banc) (holding that *Casey* displaced *Salerno* ), *cert. granted sub nom. Washington v. Glucksberg,* --- U.S. ----, 117 S.Ct. 37, 135 L.Ed.2d 1128 (1996) *and Planned Parenthood, Sioux Falls Clinic v. Miller,* 63 F.3d 1452, 1456-58 (8th Cir.1995), *cert. denied sub nom. Janklow v. Planned Parenthood, Sioux Falls Clinic,* --- U.S. ----, 116 S.Ct. 1582, 134 L.Ed.2d 679 (1996) (same) *and Casey v. Planned Parenthood of Southeastern Pa.,* 14 F.3d 848, 863 n. 21 (3d Cir.1994) (on remand) (same) *with Barnes v. Moore,* 970 F.2d at 14 n. 2.

(5th Cir.1993), *cert. denied,* 512 U.S. 1205, 114 S.Ct. 2673, 129 L.Ed.2d 809 (1994); *Campbell v. Sonat Offshore Drilling, Inc.,* 979 F.2d 1115, 1121 n. 8 (5th Cir.1992). However, we have not held that intermittent statements accompanying denials of certiorari or denials of stays pending appeal amount to an intervening change in the law. The Supreme Court itself has said that "all opinions dissenting from the denial of certiorari" are "totally unnecessary" and "examples of the purest form of dicta." *Singleton v. Commissioner,* 439 U.S. 940, 944-45, 99 S.Ct. 335, 338, 58 L.Ed.2d 335 (1978) (Stevens, J., respecting the denial of certiorari). Accordingly, for a panel of this court to overrule a prior decision, we have required a Supreme Court decision that has been fully heard by the Court and establishes a rule of law inconsistent with our own. *See United States v. Kirk,* 528 F.2d 1057, 1063-64 (5th Cir.1976) (holding that two-member concurrence was insufficient as an indicator that the Court "expressly or implicitly" overruled one of our prior decisions). The wisdom of this policy is illustrated here. As far as we can tell, the Court appears to be divided 3-3 on the *Salerno-Casey* debate, and it would be ill-advised for us to *assume* that the Court will abandon *Salerno* because three members of the Court now desire that result.[5]

More to the point, even assuming the statements in *Fargo* and *Janklow* amount to an intervening change in the law such that we may decline to follow *Barnes,* we nevertheless stay our hand on this contentious issue because its resolution is not necessary to the disposition of this case, for whether viewed under *Casey* or *Salerno,* Act 1254 is unconstitutional on its face.[6] Thus, like the district court, we apply the more rigorous *Salerno* standard to Act 1254.

IV. THE CONSTITUTIONALITY OF ACT 1254

We now turn to the heart of this appeal—whether Act 1254 comports with the Due Process

---

[5]The Eighth Circuit boldly declared that the Supreme Court in *Casey* has "effectively overruled *Salerno* for facial challenges to abortion statutes." *Miller,* 63 F.3d at 1458. As we have said, we decline to speculate about the outcome of this disagreement between the Justices of the Supreme Court.

[6]We also respectfully decline, for the reasons stated above, Justice Stevens's invitation to reconsider the wisdom of our decision in *Barnes. See Janklow,* --- U.S. at ---- n. 2, 116 S.Ct. at 1583 n. 2 (Stevens, J., mem. respecting the denial of certiorari) ("[I]t is not at all clear to me, given intervening statements by Members of this Court, [citation], that subsequent Fifth Circuit panels would follow *Barnes* ' application of the "no circumstance' test....").

Clause of the Fourteenth Amendment. We begin with a brief summary of the principles that have shaped this area and guide our decision today.

After the Supreme Court declared in *Roe v. Wade,* 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973) that women have a constitutional right to an abortion, the issue of where minors fit into the constitutional picture was soon addressed by the Court. Thus, in *Planned Parenthood of Central Missouri v. Danforth,* 428 U.S. 52, 96 S.Ct. 2831, 49 L.Ed.2d 788 (1976), the Court held that a parental or legal guardian veto of a minor's choice to have an abortion was unconstitutional. *Id.* at 74-75, 96 S.Ct. at 2843-44. "Constitutional rights," reasoned the *Danforth* Court, "do not mature and come into being magically only when one attains the state-defined age of majority. Minors, as well as adults, are protected by the Constitution and possess constitutional rights." *Id.* The Court also noted, however, that "the State has somewhat broader authority to regulate the activities of children than adults." *Id.* at 74, 96 S.Ct. at 2843.

Just how far a State can go in restricting a minor's access to abortion was sketched three years later in the seminal decision of *Bellotti v. Baird,* 443 U.S. 622, 99 S.Ct. 3035, 61 L.Ed.2d 797 (1979) (*Bellotti II* ) (plurality opinion). There, the Court was faced with a challenge to a Massachusetts statute which required a minor under the age of eighteen to obtain parental consent before an abortion could be performed, but if such consent was not given, " "consent *may* be obtained by order of a judge of the superior court for good cause shown.' " *Id.* at 625, 99 S.Ct. at 3039 (emphasis added). The Massachusetts Supreme Court had interpreted this judicial bypass provision to mean that a minor could not obtain a court order without any parental consent whatsoever. *Id.* at 646, 99 S.Ct. at 3049-50. Thus, in *Bellotti II,* the Court had to determine whether this bypass procedure satisfied the Constitution.

The Court held that it did not. The Court first recognized that parental consent statutes must "provide an alternative procedure" in the event the minor is unable to secure one or both parents' consent. *Id.* at 643, 99 S.Ct. at 3048. Turning next to the Massachusetts bypass provision, the Court concluded that Massachusetts's judicial bypass procedure "would impose an undue burden upon the exercise by minors of the right to seek an abortion." *Id.* at 647, 99 S.Ct. at 3050. In reaching this

conclusion, the Court presented the competing considerations underlying a minor's choice to terminate her pregnancy. The Court recognized that minors are vulnerable, less able than adults to make informed and mature decisions, and that parents play a central role in childrearing. *Id.* at 634, 99 S.Ct. at 3043. Balanced against these concerns, the Court noted, are the battle lines that often develop in families in which one or both parents have strong views about abortion—battle lines that prevent minors from obtaining abortions. *Id.* at 647, 99 S.Ct. at 3050. With these considerations in mind, the Court specified four constitutional requirements that must be built into parental consent statutes. The Court wrote:

> A pregnant minor is entitled to such a proceeding to show either: (1) that she is mature enough and well enough informed to make her abortion decision, in consultation with her physician, independently of her parents' wishes; or (2) that even if she is not able to make this decision independently, the desired abortion would be in her best interests. The proceeding in which this showing is made must assure that a resolution of the issue, and any appeals that may follow, will be completed with [3] anonymity and [4] sufficient expedition to provide an effective opportunity for an abortion to be obtained.

*Id.* at 643-44, 99 S.Ct. at 3048 (footnote omitted); *see also Ohio v. Akron Center for Reproductive Health,* 497 U.S. 502, 511-14, 110 S.Ct. 2972, 2979-81, 111 L.Ed.2d 405 (1990) (*Akron II* ) (presenting the four *Bellotti II* requirements). If the minor demonstrates that she is mature, well-informed, or that the abortion would be in her best interest, the *Bellotti II* Court held that the bypass decisionmaker "*must* " authorize the abortion. *Bellotti II,* 443 U.S. at 647, 648, 99 S.Ct. at 3050, 3050-51 (emphasis added). Because Massachusetts's bypass procedure did not comport with these requirements, the Court declared the statute unconstitutional. *Id.* at 647-48, 99 S.Ct. at 3050-51.

Since *Bellotti II,* lower federal courts have come to the unanimous conclusion that once a minor satisfies the maturity criteria or the best-interest test, bypass decisionmakers must order an abortion. We took the lead in *Scheinberg v. Smith,* 659 F.2d 476 (5th Cir. Unit B Oct.1981), *overruled on other grounds in Casey,* 505 U.S. 833, 112 S.Ct. 2791, 120 L.Ed.2d 674, where we held that abstention was inappropriate because a Florida bypass procedure presented federal constitutional issues. *Id.* at 481. The relevant statute provided that a court "may" order a minor to have an abortion if she demonstrates that she is sufficiently mature. *Id.* at 478 (quoting Fla. Stat.

Ann. § 390.001(4)(a) (West 1981)).  In reaching the conclusion that we should not abstain, we reasoned:

> The language of *Bellotti II* is not permissive:  "[i]f [the minor] satisfies the court that she is mature and well enough informed to make intelligently the abortion decision on her own, the court *must* authorize her to act ..." [Citation.]  Thus, whether permissive or mandatory, subsection 4(a) vests Florida courts with constitutionally impermissible discretion to ignore a minor's maturity in determining whether to authorize her abortion.

*Id.* at 481 (original emphasis).  Other Circuits have read *Bellotti II* in the same way.[7]

*Bellotti II,* of course, did not answer all of the questions surrounding minors' access to abortion.  In fact, the fate of *Bellotti II* was at first unclear because it was decided by a plurality of the Court.  Since then, however, the Court has held that *Bellotti II* is controlling precedent, *see Lambert v. Wicklund,* No. 96-858, 1997 WL 141488, at 2, --- U.S. ----, ---- - ----, --- S.Ct. ----, ---- - ----, --- L.Ed.2d ---- (U.S. Mar. 31, 1997);  *Planned Parenthood of Southeastern Pa. v. Casey,* 505 U.S. 833, 898-900, 112 S.Ct. 2791, 2832, 120 L.Ed.2d 674 (1992);  *City of Akron v. Akron Ctr. for Reproductive Health,* 462 U.S. 416, 439-40, 103 S.Ct. 2481, 2497-98, 76 L.Ed.2d 687 (1983) (*Akron I* ), and we have not thought otherwise, *Barnes v. Mississippi,* 992 F.2d 1335, 1338-39 (5th Cir.1993);  *Scheinberg v. Smith,* 659 F.2d 476, 480-81 (5th Cir. Unit B Oct.1981).[8]  The Court has also suggested that absolute anonymity is not required in bypass proceedings.  *See Akron II,* 497 U.S. at 513, 110 S.Ct. at 2980.

With these background principles in mind, we turn next to the specific provisions of Act 1254 to determine whether they comport with *Bellotti II* and its progeny.

*A. The Constitutionality of La. R.S. 40:1299.35.5(B)(4) & (6)*

---

[7]*See Planned Parenthood, Sioux Falls Clinic v. Miller,* 63 F.3d 1452, 1462 (8th Cir.1995) ("If a minor can demonstrate that she is mature, the State has no legitimate reason for imposing liberty restrictions upon her that it may not impose on an adult."), *cert. denied sub nom.  Janklow v. Planned Parenthood, Sioux Falls Clinic,* --- U.S. ----, 116 S.Ct. 1582, 134 L.Ed.2d 679 (1996); *Indiana Planned Parenthood v. Pearson,* 716 F.2d 1127, 1134 (7th Cir.1983) ("The statute does not—and constitutionally cannot—give the juvenile court the authority to refuse to waive notification despite a finding that the minor is mature.").

[8]The State appears to suggest in their brief that *Bellotti II* has been modified by subsequent decisions of the Supreme Court.  However, as our discussion suggests, the Court has never questioned the viability of the four *Bellotti II* requirements and we decline to do so in this case. More importantly, the State backed off this claim at oral argument, where it conceded that Act 1254 must be evaluated under *Bellotti II.*

Act 1254 changes Louisiana's judicial bypass procedure so that a minor who demonstrates that she is mature, well-informed, or that an abortion would be in her best interest, "may" receive judicial authorization for the abortion. La. R.S. 40:1299.35.5(B)(4), (6). In addition, Act 1254 sets up a state-sponsored "evaluation and counseling" scheme to which a minor may be referred within forty-eight hours of a hearing before the juvenile court. La. R.S. 40:1299.35.5(B)(4). The plaintiffs challenge (B)(4) and (6) on two grounds. First, the plaintiffs claim that (B)(4) and (6) violate the *Bellotti II* principle that mature and well-informed minors and those for whom an abortion is in their best interest *must* receive judicial authorization to have an abortion. Second, the plaintiffs claim that (B)(4)'s requirement that minors receive counseling from state health and social services agencies violates the *Bellotti II* principle that bypass proceedings are to proceed expeditiously. The district court agreed with the plaintiffs on both issues. We discuss each of these holdings in turn.

*1. "Shall" versus "May" in § 1299.35.5(B)(4) and (6)*

The 1981 version of § 1299.35.5(B) provided that if a minor demonstrates that she is either mature and well-informed or that the abortion would be in her best interest, the juvenile court "shall" order an abortion. La. R.S. 40:1299.35.5(B)(4), (5) (West 1992). As we noted above, this language appeared in Louisiana's judicial bypass statute because of the Supreme Court's decision in *Bellotti II,* which rendered the 1978 version of § 1299.35.5(B) unconstitutional. *See Margaret S.(I),* 488 F.Supp. at 203. And with, among other things, the addition of the mandatory "shall" language, the 1981 version of § 1299.35.5(B) survived a constitutional challenge. *Margaret S.(II),* 597 F.Supp. at 650-52.

Against this legislative backdrop, the district court declared § 1299.35.5(B)(4) and (6) unconstitutional. The court looked to the common meaning of the terms "shall" and "may" and concluded that the Louisiana Legislature intended a change in the statutory framework governing the judicial bypass procedure. "[T]he clear intent of the statutory amendment," reasoned the district court, "was to grant the substantive power of discretion to the judges of this state that is directly contrary to the rulings of the Supreme Court in *Casey, Akron II* and *Bellotti II.*" 905 F.Supp. at 364.

The State in its briefs and at oral argument strenuously asserts that § 1299.35.5(B)(4) and (6)

is constitutional because (1) the change from "shall" to "may" does not confer discretion on juvenile court judges to deny a minor an abortion if the minor is mature and well-informed or if the abortion is in the minor's best interest;  and (2) subsections(B)(4) and (6) are procedural in nature and therefore do not contradict the substantive federal law in this area.  Neither of these arguments is persuasive.

We reject the State's contention that the change from "shall" to "may" does not confer discretion on juvenile court judges.  We note by way of illustration that with one partial exception,[9] Louisiana stands alone on this front:  As far as we are aware, *every* state with a parental consent or notification statute has used the mandatory "shall" language in their judicial bypass schemes.[10]  The State's argument that subsections (4) and (6) pass constitutional muster takes one of two forms.  First, the word change does not on its face give juvenile courts the discretion to deny a minor an abortion if the minor shows that she is mature, well-informed, or that the abortion would be in her best interest;  or, alternatively, even though the statute on its face states that a juvenile court judge

---

[9]North Dakota appears to be the only other state in which a bypass decisionmaker "may" order an abortion if the *Bellotti II* requirements are met. N.D. CENT.CODE § 14-02.1-03.1(5)(a), (b)(1)-(3) (1995).  To be sure, unlike Louisiana, part of North Dakota's statutory scheme tracks *Bellotti II.* For example, if a minor in North Dakota demonstrates that she is mature and well informed, § 14-02.1-03.1(5)(a) provides that "the court *shall* issue an order authorizing a competent physician to perform the abortion procedure on the minor." (Emphasis added.)  However, if the minor fails to demonstrate she is mature and well informed, § 14-02.1-03.1(5)(b)(1), (3) provides that the court "may" order an abortion if the court determines that the abortion is nevertheless in the minor's best interests.  On this point, the North Dakota statute is similar to La. R.S. 40:1299.35.5(B)(6).

[10]*See* ALA.CODE § 26-21-4(f)(1), (2) (1996);  ARIZ.REV.STAT. ANN. § 36-2152(B) (1996); ARK.CODE ANN. § 20-16-804(1)(A), (B) (1995);  CAL. HEALTH & SAFETY CODE § 123450(c)(1), (2) (West 1996);  24 DEL.CODE ANN. § 1784(b) (1995);  GA.CODE ANN. § 15-11-114(c)(1), (2) (1996);  ILL. ANN. STAT. Ch. 750, para. 70/25(d)(1), (2) (Smith-Hurd 1996);  IND.CODE ANN. § 16-34-2-4(d) (West 1996);  KAN. STAT. ANN. § 65-6705(e)(1), (2) (1995);  KY.REV.STAT. ANN. § 311.732(4)(a), (b) (Baldwin 1996);  22 ME.REV.STAT. ANN. § 1597-A(6)(A)(5), (D)(1)-(2) (West 1995);  MICH. COMP. LAWS ANN. § 722.904(3)(a), (b) (West 1996);  MINN.STAT. ANN. § 144.343(6)(c)(i) (West 1996);  MISS.CODE ANN. § 41-41-55(4)(a), (b) (1995);  MO. ANN. STAT. § 188.028(2), (3)(a)-(b) (Vernon 1996);  MONT.CODE ANN. § 50-20-212(5)(a), (b) (1995);  NEB. REV. STAT. § 71-6903(1) (1995);  NEV. REV. STAT. § 442.2555(3)(a)-(d), (4) (1995);  N.C. GEN. STAT. § 90-21.8(e)(1), (2) (1995);  OHIO REV.CODE ANN. § 2151.85(C)(1), (2) (Baldwin 1996); 18 PA. CONS.STAT. ANN. § 3206(c), (d) (1996);  R.I. GEN. LAWS § 23-4.7-6 (1995);  S.C.CODE ANN. § 44-41-32(5) (1995);  TENN.CODE ANN. § 37-10-304(e)(1), (2) (1996);  W. VA.CODE § 16-2F-4(f)(1)(2) (1996);  WIS. STAT. ANN. § 48.375(7)(c)(1), (2) (West 1996);  WYO. STAT. § 35-6-118(b)(v)(B), (C) (1996).

"may" order an abortion if the *Bellotti II* requirements are met, we should not assume that juvenile court judges will not order an abortion in violation of *Bellotti II.*

The State itself sows the seeds for rejecting the claim that "shall" ostensibly carries the same meaning as "may." In its briefs and at oral argument, the State claims that in determining the constitutionality of § 1299.35.5(B), we should follow Louisiana's rules of statutory construction. When we consider the constitutionality of state statutes, we look to the rules of statutory construction of the state, *see, e.g., Leavitt v. Jane,* --- U.S. ----, ---- - ----, 116 S.Ct. 2068, 2069-72, 135 L.Ed.2d 443 (1996) (per curiam); *Barnes v. Mississippi,* 992 F.2d at 1341-42, mindful of the principle that we should avoid "federal-court nullification of state law," *Leavitt,* --- U.S. at ----, 116 S.Ct. at 2072, and "[w]here fairly possible, ... construe a statute to avoid a danger of unconstitutionality," *Ashcroft,* 462 U.S. at 493, 103 S.Ct. at 2526; *Akron II,* 497 U.S. at 514, 110 S.Ct. at 2980-81.

Under Louisiana law, "the paramount consideration for statutory interpretation is the ascertainment of the legislative intent and the reason or reasons which prompted the legislature to enact the law." *Fontenot v. Chevron, U.S.A., Inc.,* 676 So.2d 557, 562 (La.1996). In searching for the legislative intent behind subsections (4) and (6), we begin with Article 9 of the Louisiana Civil Code, which provides:

> When a law is clear and unambiguous and its application does not lead to absurd consequences, the law shall be applied as written and no further interpretation may be made in search of the intent of the legislature.

La. C.C. art. 9 (West 1996); *Tucker v. Fowler,* 668 So.2d 718, 719 (La.1996); *Marine Marketing Servs., Inc. v. Louisiana Dep't of Ins.,* 673 So.2d 335, 338 (La.Ct.App. 1st Cir.1996) (holding that it was reversible error for trial court to look to statutory intent when the language of the statute was neither ambiguous nor produced absurd consequences). "When the wording of a Section is clear and free of ambiguity, the letter of it shall not be disregarded under the pretext of pursuing its spirit." La. R.S. 1:4 (West 1996); *Sumrall v. Luhr Bros.,* 665 So.2d 796, 800 (La.Ct.App. 1st Cir.1995), *writ denied,* 669 So.2d 425 (La.1996).

Thus, when determining the Louisiana Legislature's intent behind subsections (4) and (6), we may only go beyond the plain terms of § 1299.35.5(B)(4) and (6) if the statute on its face is unclear

or ambiguous or if application of the terms of subsections (4) and (6) produces "absurd consequences." We have found no decisions from the Louisiana courts interpreting the meaning of subsections (B)(4) and (6), no decisions interpreting the pertinent provisions of the 1981 version of § 1299.35.5(B), and no legislative history explaining the 1995 change from "shall" to "may." We therefore apply Louisiana's principles of statutory construction to § 1299.35.5(B)(4) and (6).

We hold that § 1299.35.5(B)(4) and (6) plainly violates *Bellotti II.* As such, the statute is neither unclear nor ambiguous, nor does application of its plain terms produce absurd results. La. R.S. 1:3 (West 1996) provides:

> § 3. Words and phrases; how construed
>
> Words and phrases shall be read with their context and *shall be construed according to the common and approved usage of the language.* Technical words and phrases, and such others as may have acquired a peculiar and appropriate meaning in the law, shall be construed and understood according to such peculiar and appropriate meaning.
>
> *The word "shall" is mandatory and the word "may" is permissive.*

(emphasis added); *see also* La. C.C. art. 11 (West 1996) ("The words of a law must be given their generally prevailing meaning."); *Backhus v. Transit Cas. Co.,* 549 So.2d 283, 289 (La.1989) (same). We can imagine no more clear indication that § 1299.35.5(B)(4) and (6) on its face provides juvenile court judges discretion to deny an abortion to a minor who has met the *Bellotti II* requirements. The basic guide for interpreting Louisiana statutes states in unmistakably clear terms that "shall" means "mandatory" and that "may" means "permissive." Moreover, the common usage of the term "permissive" is "[a]llowed; allowable; that which may be done[;][l]enient; tolerant." BLACK'S LAW DICTIONARY at 1140 (6th ed.1990); *Sumrall,* 665 So.2d at 800 (looking to Black's Law Dictionary for common and approved usage). Thus, the plain language of § 1299.35.5(B)(4) and (6) states that juvenile court judges within Louisiana have the discretion to deny an abortion to a minor even though the minor demonstrates that she is mature, well-informed, or that the abortion would be in her best interest. This flies in the face of *Bellotti II* and its progeny.

Our reading of the statute does not produce absurd consequences. We have done nothing more than apply the meaning of "may" and "shall" that exists in La. R.S. 1:3 to a statute that is neither unclear nor ambiguous on its face. Louisiana courts have not declared that this sort of

bread-and-butter interpretation of statutes produces "absurd consequences." *Compare Breaux v. Hoffpauir,* 674 So.2d 234, 236 (La.1996) (holding that interpretation of Louisiana statute would lead to absurd consequence because state definition of "actual wages" would be illegal under federal statute); *Washington-St. Tammany Electrical Coop., Inc. v. Louisiana Pub. Serv. Comm'n,* 671 So.2d 908, 914 (La.1996) (absurd consequence results when interpretation contravenes the purposes of the statute).

The State would have us read § 1299.35.5(B) differently. They claim that § 1299.35.5(B) "provides only the procedural means needed for Louisiana state judges to apply the federal substantive principles in this area of law to individual cases in order to issue judgments in accordance with such substantive principles." Because, argues the State, § 1299.35.5(B) is a procedural statute, we must liberally construe the statute to effectuate its overall purposes. Second, the State points to the Louisiana Supreme Court's decision in *Rathborne Lumber & Supply Co. v. Falgout,* 218 La. 629, 50 So.2d 295 (1950), in which the court stated in dictum: "[A]lthough words of a statute are permissive, ... sometimes they may require an interpretation giving them mandatory effect ... where the context or subject matter compels such construction or where it is necessary to carry out the clear policy and intention of the Legislature." *Id.* at 635, 50 So.2d 295; *accord Romero v. Stephens,* 359 So.2d 1061, 1065 (La.Ct.App.3d Cir.1978); *Gurtler, Hebert & Co. v. Marquette Casualty Co.,* 145 So.2d 145, 147-48 (La.Ct.App. 4th Cir.1962). *But see Hornsby v. Fidelity Nat'l Bank of Baton Rouge,* 243 So.2d 96, 98 (La.Ct.App. 1st Cir.1971) (declining to follow *Falgout,* adhering to La. R.S. 1:3, and interpreting "may" and "shall" to mean "permissive" and "mandatory," respectively). Thus, concludes the State, we should follow *Falgout* in this case and effectuate the intent of the Louisiana Legislature as expressed in § 1299.35.0—"It is the intention of the Legislature of the State of Louisiana to regulate abortion to the extent permitted by decisions of the United States Supreme Court." We reject both arguments.

For us to accept the State's claim that Act 1254 is a procedural statute that merely effectuates the substantive federal law in this area, we would have to conclude that the legislature did not in 1995 intend to change § 1299.35.5(B). In other words, we would have to hold that the change from "shall"

to "may" has no bearing on the constitutionality of Act 1254 because Act 1254 does not materially change the 1981 version of § 1299.35.5(B). We cannot accept the State's proposition that Act 1254 does not change the law. First, we would in effect be interpreting the statute so that "may" means "shall," an interpretation that would be flatly inconsistent with the definition of those terms in La. R.S. 1:3. Second, we would be ignoring the Louisiana Supreme Court's understanding of statutory changes. The court has said: "The legislature is presumed to have enacted a statute in light of the preceding statutes involving the same subject matter and court decisions construing those statutes, and *where the new statute is worded differently from the preceding statute, the legislature is presumed to have intended to change the law.*" *New Orleans Rosenbush Claims Serv., Inc. v. City of New Orleans,* 653 So.2d 538, 544 (La.1995) (emphasis added). Nothing the State has said in their briefs or at oral argument persuades us that Act 1254 does not materially change the judicial bypass procedure in Louisiana.

Perhaps the most basic flaw in the State's arguments is the assumption that we must go beyond the plain meaning of § 1299.35.5(B)(4) and (6). We decline to do so because, as we have said, the language of subsections (4) and (6) is clear, unambiguous, and does not produce absurd consequences. The State points us to no authority, and we perceive none, suggesting that procedural statutes are immune from Article 9's clear mandate. In addition, the State fails to provide any authority, and again we perceive none, for the proposition that *Falgout* is an exception to Article 9's statutory construction principle.

Finally, the State argues that if we interpret § 1299.5.5(B)(4) and (6) to mean that juvenile court judges have the discretion to deny an abortion to a minor that meets the *Bellotti II* requirements, we would be indulging the inappropriate assumption that Louisiana judges will decline to follow the federal Constitution. We agree with the State that we should refrain from assuming that state actors will violate the law. "[T]he Fifth Circuit is not," as we have recognized, "a "roving commission[ ] assigned to pass judgment on the validity of the Nation's laws.' " *Barnes v. Mississippi,* 992 F.2d at 1342 (quoting *Broadrick v. Oklahoma,* 413 U.S. 601, 610-11, 93 S.Ct. 2908, 2915, 37 L.Ed.2d 830 (1973)).

However, we make no such assumption here. We have held that § 1299.35.5(B)(4) and (6) *on its face* is inconsistent with *Bellotti II* and its progeny because it invests juvenile court judges with the discretion to deny a minor an abortion even though she satisfies the *Bellotti II* requirements. As such, this case is plainly distinguishable from our decision in *Barnes v. Mississippi,* 992 F.2d 1335. There, the plaintiffs brought a facial challenge against a rule promulgated by the Mississippi Supreme Court pursuant to a bypass statute that did *not* on its face conflict with *Bellotti II. Id.* at 1337-41. The Mississippi statute notably provided that if a minor demonstrates that she is mature and well-informed or that the abortion would be in her best interest, the court *must* order the abortion. *Id.* at 1342 n. 4. The procedural rule challenged by the plaintiffs, although it was worded differently than the language in *Bellotti II,* did not on its face conflict with the statute. *Id.* at 1341 ("[T]he rule requires a minor to plead that notifying her parents of the abortion is not in her best interest."). Accordingly, we rejected the challenge to the Mississippi Supreme Court's procedural rule on the ground that "[i]f a Mississippi court does follow [the procedural rule] so as to conflict with *Bellotti,* a plaintiff will be free to launch an as-applied challenge to the bypass procedure." *Id.* at 1342.

Here, we face an entirely different situation. Juvenile court judges within Louisiana have a legislatively prescribed choice whether to order an abortion for a minor who is mature, well-informed, or for whom an abortion would be in her best interest. It is this discretion itself, and not the exercise of it, that we find inconsistent with *Bellotti II.*

In short, § 1299.35.5(B)(4) and (6) is unconstitutional. We affirm the district court's decision to permanently enjoin these provisions of Act 1254.

*2. Expeditiousness in § 1299.35.5(B)(3) and (4)*

Section 1299.35.5(B)(3) provides that "[e]ach application shall be heard in chambers, anonymously, in a summary manner, and within forty-eight hours of the filing thereof." Except for the admonition that the hearing proceed in a "summary manner," subsection (B)(3) on its face does not provide a specific time frame for deciding the merits of a minor's application. Section 1299.35.5(B)(4) provides that a juvenile court may require a minor to attend various state-sponsored evaluation and counseling sessions within forty-eight hours of the ex parte hearing with the juvenile

court judge. Subsection (B)(4), like subsection (3), does not on its face provide a time frame within which that evaluation is to be completed and the results forwarded to the court. Nor does subsection (4) contain the "summary manner" language found in subsection (3).

The plaintiffs claim that § 1299.35.5(B)(3) and (4) violates the *Bellotti II* requirement that bypass procedures proceed expeditiously because both subsections provide an indefinite time period for the juvenile court judge to decide the merits of the minor's application. The district court agreed with the plaintiffs that subsections (B)(3) and (4) did not meet the *Bellotti II* requirement for expeditious resolution of bypass applications. 905 F.Supp. at 365.[11] On appeal, the State argues that the district court erred in reaching this conclusion because the statute requires juvenile court judges to conduct the proceedings in a "summary manner," and to hold that this provision violates *Bellotti II,* we "would have to assume that a state district judge would intentionally ignore the requirements of state law and the dictates of the United States Supreme Court."

We agree with the district court that subsections (B)(3) and (4) are inconsistent with *Bellotti II* because they do not provide for an expeditious resolution of the minor's bypass application. We again frame our analysis in accord with Louisiana's rules of statutory construction and determine whether proceeding in a "summary manner" satisfies *Bellotti II* 's expedition requirement. Louisiana Civil Code article 2595 (West 1996) provides that in a summary proceeding, "[t]he court shall render its decision *as soon as practicable* after the conclusion of the trial of a summary proceeding and, *whenever practicable,* without taking the matter under advisement." (Emphasis added).

Such an open-ended bypass procedure has never been approved. We should not, as the Supreme Court has suggested, "invalidate[ ] [a bypass] statute on a facial challenge based upon a worst-case analysis that may never occur." *Akron II,* 497 U.S. at 514, 110 S.Ct. at 2981. The

---

[11]The district court stated that "the provisions of Act 1254 *amend Section B(4)* of the Act to require that the juvenile court hear the bypass application within 48 hours, without any requirement as to when the application must be ruled upon." 905 F.Supp. at 365 (emphasis added). Our reading of the statute, however, reveals that subsection *B(3)* provides the forty-eight hour time frame and that the only change made by Act 1254 was to substitute the word "confidentially" with "anonymously." Act 1254 did not for the first time introduce the forty-eight hour and "summary manner" requirements; both appeared in the 1981 version of § 1299.35.5(B).

Supreme Court has held that a seventeen- and twenty-two-day delay satisfies *Bellotti II. Akron II,* 497 U.S. at 514, 110 S.Ct. at 2980-81 (22 days); *Ashcroft,* 462 U.S. at 479 n. 4, 491 n. 16, 103 S.Ct. at 2519 n. 4, 2525 n. 16 (17 days). An indefinite period, however, has been rejected. In *Glick v. McKay,* 937 F.2d 434 (9th Cir.1991),[12] the Ninth Circuit determined the constitutionality of the bypass procedure in Nevada's parental notification statute. Like Louisiana's bypass procedure, Nevada's statute did not on its face provide a time frame within which a minor's bypass application was to be decided. *Id.* at 438. The Ninth Circuit struck down the statute as inconsistent with *Bellotti II.* "Under the statute," reasoned the court, "the district court could ... delay the bypass procedure indefinitely. The district court review procedure does not meet the *Bellotti* expediency criterion." *Id.* at 440-41; *see also id.* at 441 n. 4 (stating that "an indefinite period does not" satisfy *Bellotti II* ).

Subsections (B)(3) and (4) plainly conflict with *Bellotti II* because the juvenile court is not required to rule on the minor's application within any specified time nor are state counselors required to report back to the juvenile court within any specified time. We hold that "whenever practicable" does not satisfy constitutional standards of expediency. There is no fall-back (or constructive authorization) provision within subsection (3) that deems a minor's application granted in the event the juvenile court does not act within a particular time frame. Thus, not only do subsections (3) and (4) fail to provide any specific time within which a minor's application will be decided, but they give no assurances (assurances required by *Bellotti II* ) that the proceedings will conclude expeditiously.

The State attempts to rescue subsection (3) by pointing to Article 2591 (West 1961) of the Louisiana Civil Code, which provides: "Summary proceedings are those which are conducted with *rapidity,* within the delays allowed by the court, and without citation and the observance of all the formalities required in ordinary proceedings." (Emphasis added). Plainly, the "rapidity" language refers to the expeditiousness of the summary proceeding itself, not to the time a judge has to decide

---

[12]The Supreme Court has disapproved the analysis in *Glick,* in which the Ninth Circuit held unconstitutional a bypass procedure which allowed a minor to have an abortion if *parental notification,* and not the abortion itself, was not in the minor's best interest. *Lambert v. Wicklund,* 1997 WL 141488, at \*2-\*4, --- U.S. at ---- - ----, --- S.Ct. at ---- - ----. Nothing in *Lambert* affects *Glick*'s holding regarding *Bellotti II*'s expediency requirement.

the merits of a case. We inevitably return to article 2595 which *does,* as we have said, prescribe the time frame within which a decision in a summary proceeding is to be rendered—"as soon as practicable." This is insufficient under *Bellotti II.*

Finally, contrary to the State's contention, we do not portray Louisiana juvenile court judges or state-employed counselors as individuals who would intentionally violate *Bellotti II,* nor are we analyzing the constitutionality of subsections (B)(3) and (4) under a worst-case scenario. We have simply looked to the plain terms of § 1299.35.5(B)(3) and (4) to determine the rules juvenile court judges are required to follow when presented with a bypass application from a minor. The Louisiana Legislature has told them that they must rule on the application "as soon as" or "whenever practicable." This violates *Bellotti II* 's expedition requirement on its face. We therefore affirm the district court's decision to permanently enjoin subsections (3) and (4).

*B. The Constitutionality of La. R.S. 40:1299.35.5(B)(5)*

 Section 1299.35.5(B)(5) provides, among other things, that the juvenile court "shall" notify the parent(s) or legal guardian if the court determines that such notification is in the minor's best interest. The plaintiffs contend, and the district court agreed, that § 1299.35.5(B)(5) does not satisfy *Bellotti II* 's anonymity requirement. The State, on the other hand, contends that § 1299.35.5(B)(5) comports with *Bellotti II.* The State relies on the following language in *Bellotti II* for this conclusion:

> [T]he court may deny the abortion request of an immature minor in the absence of parental consultation if it concludes that her best interests would be served thereby, or the court may in such a case defer decision *until there is parental consultation in which the court may participate.*

*Bellotti II,* 443 U.S. at 648, 99 S.Ct. at 3050-51 (emphasis added). From this statement, the State argues that the *Bellotti II* Court "seem[ed] to encourage [parental notification], if the courts believe to do so is in the minors [*sic* ] best interest." We agree with the district court and conclude that the State is mistaken.

As the plaintiffs and the district court correctly note, this language from *Bellotti II* in no way permits *the independent bypass decisionmaker* to contact a minor's parents, inform them that their minor daughter is seeking an abortion without their consent, and then ask the parents to participate in the process of deciding whether the abortion would be in the minor's best interest. We read the

statement from *Bellotti II* to mean that a Louisiana juvenile court can refuse to authorize a minor's abortion if parental notification is in the minor's best interest, or the court may wait until the minor herself seeks parental consultation, and then, with both the parents' and minor's input, determine whether an abortion is in the minor's best interest.

Any other interpretation of this language—or shall we say, the State's interpretation—would cut the core out of *Bellotti II.* If *Bellotti II* means anything, it surely means that States seeking to regulate minors' access to abortion must offer a credible bypass procedure, *independent of parents or legal guardians,* in a parental consent statute like the one in Louisiana. Plainly, the State has attempted to enter through the proverbial back door by suggesting that the "best-interest-of-the-minor" inquiry cannot arbitrarily exclude the input of parents or a legal guardian. Although the Supreme Court has recognized that bypass decisionmakers can consider whether parental notification would be in the best interest of the minor, *Bellotti II,* 443 U.S. at 640, 99 S.Ct. at 3046-47, and that complete anonymity is not required, *Akron II,* 497 U.S. at 513, 110 S.Ct. at 2980, the Court has *not* held that anonymity may give way to parental notification in bypass statutes.

The Supreme Court's decision in *H.L. v. Matheson,* 450 U.S. 398, 101 S.Ct. 1164, 67 L.Ed.2d 388 (1981) is not to the contrary. There, the Court upheld a parental notification provision, reasoning that "a statute setting out a "mere requirement of parental notice' does not violate the constitutional rights of an immature, dependent minor." *Id.* at 409, 101 S.Ct. at 1171. Because the Court has yet to address the question of whether a bypass procedure is required for parental *notification* statutes, we do not read *Matheson* to hold that parental notification is an exception to the *Bellotti II* anonymity requirement. Indeed, if we were to agree with the State that *Matheson* modified the anonymity requirement in *Bellotti II,* we would create an exception that swallows the rule. The central thrust of *Bellotti II* was to ensure that minors who could not or would not seek the consent of a parent or legal guardian have access to a bypass procedure that would ensure anonymity from parents who may "obstruct both an abortion and their access to court." *Bellotti II,* 443 U.S. at 647, 99 S.Ct. at 3050. By requiring a juvenile court judge to notify a minor's parents if the judge finds that doing so would be in the minor's best interest, Louisiana has undermined the independent

bypass procedure prescribed in *Bellotti II.*

We affirm the district court's conclusion that subsection (5) of § 1299.35.5(B) is inconsistent with *Bellotti II* 's anonymity requirement.

CONCLUSION

We do not question Louisiana's interest in regulating the circumstances under which minors may obtain abortions or its interest in ensuring that minors make an informed choice to have an abortion. The Supreme Court has stressed, as have we, the need to balance parents' strong interest in participating in a minor's upbringing against a minor's constitutional right to an abortion. Beginning with *Bellotti II,* the Supreme Court has balanced these competing interests in a manner which mandates our decision today. Accordingly, if the Louisiana Legislature chooses to modify its judicial bypass procedure, it must do so consistent with the teachings of the Supreme Court and our Constitution. We hold that Act 1254 is facially unconstitutional under the Due Process Clause of the Fourteenth Amendment of the Constitution.

The summary judgment of the district court permanently enjoining Act 1254 is AFFIRMED.

AFFIRMED.

EMILIO M. GARZA, Circuit Judge, concurring specially:

For the second time in my judicial career, I am forced to follow a Supreme Court opinion I believe to be inimical to the Constitution. *See Sojourner T. v. Edwards,* 974 F.2d 27, 31 (5th Cir.1992) (Garza, J., concurring specially). Although I have misgivings about whether the Act's failure to require expedient decision can support a *facial* challenge under *United States v. Salerno,* 481 U.S. 739, 745, 107 S.Ct. 2095, 2100, 95 L.Ed.2d 697 (1987), I generally agree with the majority's opinion that certain provisions of Act 1254 are unconstitutional according to the Supreme Court's opinion in *Bellotti v. Baird,* 443 U.S. 622, 99 S.Ct. 3035, 61 L.Ed.2d 797 (1979) (*Bellotti II* ). I respectfully disagree with the *Bellotti II* Court that the Constitution requires the result we reach today. I do not believe that the language of the Fourteenth Amendment speaks to the discretion judges may exercise in permitting minors to have an abortion. I think that the *Bellotti II* opinion crossed the line from judicial review to judicial legislation. Furthermore, in the absence of governing

constitutional text, I believe that ontological issues such as abortion are more properly decided in the political and legislative arenas. Mindful, however, that the Constitution invests the Supreme Court with the final say, I defer to the Court's authority and concur in the majority opinion.

I

My disagreement with the holding of *Bellotti II* begins generally with substantive due process. Although the Supreme Court has assumed that the Fourteenth Amendment has a substantive component, *see Planned Parenthood v. Casey,* 505 U.S. 833, 846, 112 S.Ct. 2791, 2804, 120 L.Ed.2d 674 (1992) (Due Process Clause "has been understood to contain a substantive component"), it has found the boundaries of such substantive rights to be elusive. Nonetheless, courts have extended such protections quite far, as evidenced by the *Bellotti II* opinion, which establishes ambitious and very specific minimum requirements for parental consent statutes in the abortion context.

A

The constitutional mandate of *Bellotti II* springs from a single word used by the drafters of the Civil War amendments: liberty. *Casey,* 505 U.S. at 846, 112 S.Ct. at 2804. The relevant portion of the Fourteenth Amendment provides that "[n]o state shall ... deprive any person of life, liberty, or property, without due process of law...." U.S. Const. amend. XIV. Drafted in the wake of the Civil War, this clause stands as a guarantee against arbitrary action against people by state governments. *Daniels v. Williams,* 474 U.S. 327, 331, 106 S.Ct. 662, 665, 88 L.Ed.2d 662 (1986).

"Substantive" due process, as the argument goes, is implicit in this notion. Proponents suggest (or assume) that some government action departs so far from the constitutional scheme that no amount of process will be sufficient to ratify its legitimacy. *See, e.g., Casey,* 505 U.S. at 846, 112 S.Ct. at 2804; *Daniels,* 474 U.S. at 331, 106 S.Ct. at 665. The Court has "understood" the Fourteenth Amendment to include such guarantees at least as far back as 1887, *see Casey,* 505 U.S. at 846, 112 S.Ct. at 2804 (citing *Mugler v. Kansas,* 123 U.S. 623, 660-61, 8 S.Ct. 273, 291, 31 L.Ed. 205 (1887)) (holding that the Fourteenth Amendment protected brewer from arbitrary deprivation of property), although the Court has probably understood the notion of due process to

include a substantive component at least as early as *Dred Scott v. Sanford,* 60 U.S. (How.) 393, 450, 15 L.Ed. 691 (1856) (interpreting the Fifth Amendment to say that "an act of Congress which deprives a citizen of the United States of his liberty or property, merely because he came himself or brought his property into a particular Territory of the United States, and who had committed no offence against the laws, could hardly be dignified with the name of due process of law.").

Employing this theory of substantive guarantees, the Supreme Court has read the word "liberty" to create extensive, "fundamental" rights that the state may burden only under the most compelling of circumstances and only in the narrowest of ways. The Court has used the Fourteenth Amendment to constitutionalize such issues as contraception, *Carey v. Population Services Int'l* 431 U.S. 678, 684-85, 97 S.Ct. 2010, 2015-16, 52 L.Ed.2d 675 (1977);  *Griswold v. Connecticut,* 381 U.S. 479, 483-86, 85 S.Ct. 1678, 1681-82, 14 L.Ed.2d 510 (1965);  municipal housing regulations, *Moore v. East Cleveland,* 431 U.S. 494, 499, 97 S.Ct. 1932, 1935, 52 L.Ed.2d 531 (1977) (plurality opinion);  child rearing, *Santosky v. Kramer,* 455 U.S. 745, 753, 102 S.Ct. 1388, 1394, 71 L.Ed.2d 599 (1982);  marriage, *Loving v. Virginia,* 388 U.S. 1, 12, 87 S.Ct. 1817, 1823, 18 L.Ed.2d 1010 (1967);  school curricula, *Pierce v. Society of Sisters,* 268 U.S. 510, 535, 45 S.Ct. 571, 573, 69 L.Ed. 1070 (1925);  and, of course, abortion, *Roe v. Wade* 410 U.S. 113, 152-53, 93 S.Ct. 705, 726-27, 35 L.Ed.2d 147 (1973). This list is only a partial catalogue of issues, not mentioned anywhere in the Constitution generally or the Fourteenth Amendment specifically, that the Supreme Court has removed from the political arena. The Court's good intentions, expressed in these cases, have slowly eroded the scope of public debate.

I do not believe that we should narrow the scope of procedural protection afforded by the Fifth or Fourteenth Amendments. Nor do I dispute that the Fourteenth Amendment incorporates most of the Bill of Rights. *See, e.g., Casey,* 505 U.S. at 847, 112 S.Ct. at 2804; *Duncan v. Louisiana,* 391 U.S. 145, 147-148, 88 S.Ct. 1444, 1446, 20 L.Ed.2d 491 (1968). However, I think it is a mistake to create new substantive rights, of whole cloth, for every state and for all time, under implicit "penumbras" of a written Constitution; *see, e.g., Griswold v. Connecticut,* 381 U.S. 479, 484, 85 S.Ct. 1678, 1681, 14 L.Ed.2d 510 (1965) ("[S]pecific guarantees in the Bill of Rights have

penumbras, formed by emanations from those guarantees that help give them life and substance."); through constitutional extrapolation, *see id.* at 484, 85 S.Ct. at 1682 (holding that contraception, although not mentioned in the Bill of Rights, "concerns a relationship lying within the zone of privacy created by several fundamental constitutional guarantees"); or by mere assumptions, *see Casey,* 505 U.S. at 982, 112 S.Ct. at 2875 (Scalia, J., dissenting in part) (" "[R]easoned judgment' does not begin by begging the question, as *Roe* and subsequent cases unquestionably did by assuming that what the State is protecting is the mere "potentiality of human life.' ").

Perhaps many of the most important substantive due process cases could have been decided under other constitutional provisions, such as the First Amendment. *See, e.g., Meyer v. Nebraska,* 262 U.S. 390, 399-403, 43 S.Ct. 625, 627, 67 L.Ed. 1042 (1923) (striking down statute that forbade teaching of German in grammar school). Alternatively, some of these issues could have been dealt with by the states—if no extant constitutional provision stood in conflict with these laws, the Court need not have stretched the Fourteenth Amendment to create conflict. State legislatures could have changed laws as public attitudes changed. *See, e.g.,* Conn. Gen.Stat. § 53-32 (1969) (repealing Connecticut laws at issue in *Griswold* prohibiting use of contraceptives). It is a feature of a healthy democracy that evolving public norms find voice in new laws supported by the people.

Some of these judicial decisions, such as invalidating statutes that discriminate based on race, reflect our nation's highest aspirations as an individualist, pluralist society. Nonetheless, judicial officers should not force the pace of change nor bind the nation to wise policy using loose interpretations of our written Constitution. Neither our aspirations about privacy, nor our concerns about the consequences of leaving certain matters for states to decide, invests us with the authority to nullify state law. Article III courts should not cloak political choices with claims that those choices are required by the Due Process Clause. *See Casey,* 505 U.S. at 983, 112 S.Ct. at 2875 (Scalia, J., dissenting in part).

Currently, the boundaries of substantive due process are less than pellucid. As these unenumerated substantive rights are by their natures not explicit, the Court has understandably had difficulty in fixing their outer perimeter. We have been told by the Court that the limits of due

process cannot be reduced to a formula, *Poe v. Ullman,* 367 U.S. 497, 542, 81 S.Ct. 1752, 1776, 6 L.Ed.2d 989 (1961) (Harlan, J., dissenting), and that the doctrine's "boundaries are not susceptible of expression as a simple rule." *Casey,* 505 U.S. at 849, 112 S.Ct. at 2806. The Court has suggested that substantive rights must be so "implicit in the concept of ordered liberty," that "neither liberty nor justice would exist if [they were] sacrificed," *Palko v. Connecticut,* 302 U.S. 319, 325, 326, 58 S.Ct. 149, 151, 152, 82 L.Ed. 288 (1937). It has also said that "at the heart of liberty is the right to define one's own concept of existence, of meaning, of the universe, and of the mystery of human life." *Casey,* 505 U.S. at 851, 112 S.Ct. at 2807. As illustrated by the catalogue of substantive due process rights discussed earlier, the Fourteenth Amendment (thus interpreted) puts quite a bit of public policy within the "heart" of liberty. This is how the Supreme Court has dealt with the admittedly difficult issue of circumscribing which rights and liberties the Fourteenth Amendment comprises.

I do not believe that such open-ended inquiry can be helpful to judges interpreting the Fourteenth Amendment. We must return to those principles embedded in the Constitution. First, as Chief Justice Marshall said in *Marbury v. Madison,* "it is emphatically the province and duty of the judicial department to say what the law is." 5 U.S. (Cranch) 137, 177, 2 L.Ed. 60 (1803). Importantly, "to say what the law is" presupposes that there is law to interpret. The Constitution does not charge courts with legislation, merely interpretation.

Second, the powers of legislatures are limited, but not by the inherent power of the courts. They are circumscribed by a written constitution: "The powers of the legislature are defined and limited; and that those limits may not be mistaken and forgotten, *the constitution is written.*" *Id.* 5 U.S. at 176 (emphasis added). Indeed, the Framers specifically protected against the combination of legislative and judicial powers in one branch. "The judges can exercise no executive prerogative, though they are shoots from the executive stock; nor any legislative function, though they may be advised by legislative councils.... "Were the power of judging joined with the legislative, the life and liberty of the subject would be exposed to arbitrary control, for the *judge* would then be the *legislator.*' " The Federalist No. 47, at 303 (James Madison) (Clinton Rossiter ed., 1961) (quoting Charles Montesquieu, *The Spirit of Laws,* Vol. I, Book IX (1748)).

Third, the people, not the courts, established the Constitution;  it is a document of self-determination, not judicial determination.  "That *the people* have an original right to establish, for their future government, such principles as, in their opinion, shall most conduce to their own happiness, is the basis on which the whole American fabric has been erected."  *Marbury,* 5 U.S. at 176 (emphasis added).  In the context of unenumerated constitutional rights, the Supreme Court has constructed a new constitutional amendment out of the single word "liberty."  Instead of interpreting liberty in the context of the Constitution, the Court would have us interpret the Constitution in the context of its broad interpretation of liberty.  Viewed expansively, this word can turn the entire Constitution on its head and nullify any restraints on the Court's authority, judicial self-restraint notwithstanding, which the Constitution itself rejects.

Fourth and finally, the Constitution is a flexible and dynamic document, designed to have as much vitality today as it did the day it was written.  "This provision is made in a constitution, intended to endure for ages to come, and consequently, to be adapted to the various crises of human affairs."  *M'Culloch v. Maryland,* 17 U.S. (Wheat.) 316, 415, 4 L.Ed. 579 (1819).  Although historical circumstances change, the principles that undergird the Constitution do not.

With these principles in mind, we should consider the proper way to interpret the Fourteenth Amendment, and accordingly, the proper scope of substantive due process.  As a starting point, an understanding of what constitutional amendments were supposed to mean should guide any attempt to interpret them.  The power to amend the Constitution is one of the greatest powers bestowed by the Framers.  The power to amend the Constitution gives the people the authority to constrain majorities present and future.  Because amendments are so powerful, the Constitution provides a rigorous proposal and ratification procedure for constitutional amendments in Article V, giving special constitutional ratifying authority to the pronouncements of three-fourths of the states.  This great authority to bind future generations is seated in the American people.  Because only the drafters and the states have the power to amend, their understanding of the words they choose should govern the courts' interpretations where those words are ambiguous.  Courts that stray beyond that meaning are acting beyond their authority.  In *Casey,* however, the courts employed no textual analysis or

legislative history, only judicial "understandings." *Casey,* 505 U.S. at 846, 112 S.Ct. at 2804.

That is not to say that the Constitution or the Bill of Rights must be frozen in time. As Marshall said in *M'Culloch,* the Constitution is meant to endure, and its application must be flexible. No one would dispute that the First Amendment protects television or the internet, or that the Fourth Amendment protects cellular phones, even though none of these technologies existed in the late eighteenth century. The understanding of the drafters and ratifiers that Congress should not abridge the freedom of the media must guide the courts' application of timeless principles to changed circumstances. In this way, the understandings that undergird the Constitution and its amendments continue to have vitality in areas unforeseen at the drafting.

To say that these understandings are flexible, however, is emphatically not to say that changed values gain constitutional precedence to govern changed circumstances. That is a different proposition altogether. It is unwise to read the Constitution by reference to a telephone poll, *see Casey,* 505 U.S. at 962, 112 S.Ct. at 2865 (Rehnquist, C.J., dissenting in part); even if it were possible, we have no authority to do so. Article V does not give amendment power to contemporary, majority viewpoints. It explicitly sets forth a procedure to be followed for amendment.

To date, judicial attempts at understanding the meaning of the Fourteenth Amendment have proven unsatisfactory. Although the Court has held that the Due Process Clause incorporates most of the Bill of Rights against the states, *Duncan v. Louisiana,* 391, U.S. 145, 147-48, 88 S.Ct. 1444, 1446, 20 L.Ed.2d 491 (1968), it has repudiated the notion that the Bill of Rights limits the interpretation of that clause. *See Casey,* 505 U.S. at 847, 112 S.Ct. at 2804-05 (citing disagreement with *Adamson v. California,* 332 U.S. 46, 68-92, 67 S.Ct. 1672, 1683-97, 91 L.Ed. 1903 (1947) (Black, J., dissenting)). The Court has also rejected the idea that the drafters of the Due Process Clause only meant to protect citizens from state actions that were unconstitutional under the Due Process Clause of the Fifth Amendment or proscribed by other law when the Fourteenth Amendment was ratified. *Id.* (citing disagreement with *Michael H. v. Gerald D.,* 491 U.S. 110, 127-28 n. 6, 109 S.Ct. 2333, 2344-45 n. 6, 105 L.Ed.2d 91 (1989)).

In his seminal dissent in *Poe v. Ullman* (later adopted by the plurality in *Casey),* Justice Harlan

provided a different view of how to interpret the Fourteenth Amendment. Justice Harlan suggested that we consult what "history teaches are the traditions from which [liberty] developed as well as the traditions from which it broke." Justice Harlan does not suggest that we look at the history of the Fourteenth Amendment, but rather to *American history and traditions generally* to determine what liberties have been protected. At first blush, American history mightseem to be a good point of reference—a fixed, knowable tradition from which we might draw understanding. There are two major problems with this approach. First, the traditions from which liberty developed may suggest a different role for government than was actually inscribed into the Fourteenth Amendment. Should the liberty of freed slaves under the Fourteenth Amendment truly be defined by reference to American history leading up to the Civil War?

The second major difficulty of Justice Harlan's approach is that one can find whatever one seeks in history, if one is so determined. It is certainly true that Justice Harlan's look into the American history will produce a richer record from which to draw conclusions. However, to canvas all of American history will likely produce conflicting traditions, allowing those who look to find whatever answers they prefer. *See Michael D.,* 491 U.S. at 137, 109 S.Ct. at 2349 (Brennan, J., dissenting) (Tradition "can be as malleable and as elusive as "liberty' itself...."); *Moore v. East Cleveland,* 431 U.S. 494, 549, 97 S.Ct. 1932, 1961, 52 L.Ed.2d 531 (1977) (White, J., dissenting) ("What the deeply rooted traditions of the country are is arguable; which of them deserve the protection of the Due Process Clause is even more debatable.").

The historical approach thus breaks down into the following conundrum: who decides which liberties were recognized in our history? How do we decide which history or tradition is relevant? The task, however, is not to interpret American history, but to interpret the words of the Fourteenth Amendment. The federal judiciary is not composed of historians, merely lawyers whose expertise is neither "history" nor "tradition." As used in *Casey,* concepts such as history and tradition have become ersatz constitutional provisions that courts substitute for the actual words.

Understanding the meaning of the word "liberty" in the context of the legislative history of the Fourteenth Amendment avoids many of these judicial struggles to determine who gets to define

history. Interpreting the Fourteenth Amendment by reference to the understanding of the drafters and ratifiers is an approach more closely targeted to the task of interpreting a written constitution. In fact, that is what the Supreme Court does in almost all other provisions of the Constitution.

I realize that sometimes legislative history is less clear than the Amendment or statute it is supposed to illuminate, *see, e.g., United States v. Public Utilities Commission,* 345 U.S. 295, 320, 73 S.Ct. 706, 720, 97 L.Ed. 1020 (1953) (Jackson, J., concurring), and Congress often speaks with more than one voice as to why it chose particular language in a statute. *Compare, e.g., TVA v. Hill,* 437 U.S. 153, 173-93, 98 S.Ct. 2279, 2291-2301, 57 L.Ed.2d 117 (1978) (legislative history of Endangered Species Act expresses Congressional intent that Court should enjoin completion of federal dam that would threaten endangered species) *with id.* at 207-10, 98 S.Ct. at 2308-09 (Powell, J., dissenting) (legislative history of statute supports opposite view) (cited in Stephen Breyer, *On the Uses of Legislative History in Interpreting Statutes,* 65 S. Cal. L.Rev. 845, 862 n. 39 (1991)). Indeed, some Amendments and statutes have scarce history to consider. Such difficulties, however, are confronted by courts every day. Perfection in legislative history is not to be expected: I do not pretend that this judicial task will be easy, only necessary. Fortunately the drafters of the Fourteenth Amendment explained in some detail what they meant to accomplish, the legislative history is particularly useful in interpreting the words of the Amendment. *See, e.g., Adamson v. California,* 332 U.S. 46, 92-123, 67 S.Ct. 1672, 1696-1711, 91 L.Ed. 1903 (1947) (appendix to dissent of Black, J., citing extensive legislative history of Fourteenth Amendment in Congress).

The drafters of the Fourteenth Amendment certainly had more modest goals in mind by using the term "liberty" than the modern Supreme Court has. Liberty for the drafters came in the context of dealing with restrictive racial laws in the South. In the floor debates surrounding the drafting of the Fourteenth Amendment, the bill sponsor in the Senate, Senator Trumbull, suggested that the liberty interests involved were intended to deal with these statutes:

> "[S]tatutes of Mississippi ... provide that if any person of African descent residing in that State travels from one county to the another without having a pass or a certificate of his freedom, he is liable to be committed to jail and to be dealt with as a person who is in the State without authority. Other provisions of the statute prohibit any negro or mulatto from having fire-arms; and one provision of the statute declares that for "exercising the functions of a minister of the Gospel free negroes ... on conviction, may be punished by ... lashes....'

[ ... ] The statutes of South Carolina make it a highly penal offense for any person, white or colored, to teach slaves;  and similar provisions are to be found running through all the statutes of the late slaveholding States....  The purpose of the bill ... is to destroy all these discriminations...."

*Adamson,* 332 U.S. at 99-100, 67 S.Ct. at 1700 (quoting Cong. Globe, 39th Cong. 1st Sess. 474 (1865)).  This does not suggest that the term "liberty" as used in the Fourteenth Amendment applies only to race-conscious statutes, indeed the plain language of the Fourteenth Amendment admits a broader interpretation.  However, it does suggest a context in which to decide how to interpret the Amendment consistent with the drafters' intent, a context that was not intended to include abortion.

I recognize that the Supreme Court has not accepted this approach.  Indeed, the Court has recently held that such a fixed interpretive guideline is unhelpful in interpreting the Fourteenth Amendment.  In *Casey,* the plurality stated that the Court should examine each case as it comes, *ad hoc,* to determine what substantive rights the Fourteenth Amendment guarantees, using "reasoned judgment."  *Casey,* 505 U.S. at 849, 112 S.Ct. at 2806.  The power of Article III courts to invalidate state laws under the Constitution is not so expansive—even the reasoned judgment of our wisest jurists cannot replace the written constitution as authority.

*Casey* best illustrates the approach taken by the Supreme Court.  Near the end of the plurality opinion, the Court says that "[e]ach generation must learn anew that the Constitution's written terms embody ideas and aspirations that survive more ages than one."  *Casey,* 505 U.S. at 901, 112 S.Ct. at 2833.  This is in line with my earlier suggestion that old understandings apply to new situations and that the Constitution is limited by its words.  But that is not what the *Casey* court actually did in the opinion.  In deciding whether the abortion regulations at stake fell within the ambit of the Fourteenth Amendment, the court cited Justice Harlan's dissent in *Poe v. Ullman.*  Specifically the Court quoted two extensive passages of that opinion.  First, the Court asserted that neither the Bill of Rights nor the specific practices of states at the time of the ratification of the Fourteenth Amendment marks the outer limits of substantive due process:

"[T]he full scope of the liberty guaranteed by the Due Process Clause cannot be found in or limited by the precise terms of the specific guarantees elsewhere provided in the Constitution. This "liberty' is not a series of isolated points pricked out in terms of the taking of property;  the freedom of speech, press, and religion;  the right to keep and bear arms;  the freedom from unreasonable searches and seizures;  and so on.  It is a rational continuum which, broadly

speaking, includes a freedom from all substantial arbitrary impositions and purposeless restraints, ... and which also recognizes, what a reasonable and sensitive judgment must, that certain interests require particularly careful scrutiny of the state needs asserted to justify their abridgement."

*Casey,* 505 U.S. at 848-49, 112 S.Ct. at 2805 (quoting *Poe,* 367 U.S. at 543, 81 S.Ct. at 1777 (Harlan, J., dissenting on jurisdictional grounds)). The *Casey* Court continued, quoting from *Poe,* that the adjudication of substantive due process claims has traditionally been, and will continue to be, a matter of "reasoned judgment":

"Due process has not been reduced to any formula; its content cannot be determined by reference to any code. The best that can be said is that through the course of this Court's decisions it has represented the balance which our Nation, built upon postulates of respect for the liberty of the individual, has struck between that liberty and the demands of organized society. If the supplying of content to this Constitutional concept has of necessity been a rational process, it certainly has not been one where judges have felt free to roam where unguided speculation might take them. The balance of which I speak is the balance struck by this country, having regard to what history teaches are the traditions from which it developed as well as the traditions from which it broke. That tradition is a living thing. A decision of this Court which radically departs from it could not long survive, while a decision which builds on what has survived is likely to be sound. No formula could serve as a substitute, in this area, for judgment and restraint."

*Casey,* 505 U.S. at 849-50, 112 S.Ct. at 2806, (quoting *Poe,* 367 U.S. at 542, 81 S.Ct. at 1776 (Harlan, J., dissenting on jurisdictional grounds)). The two block quotes selected by the Court from *Poe* are perhaps more telling for what they omitted, however. For between these two long, lofty (and transposed) quotes in *Poe,* lie two telling sentences. After the above-quoted sentence, "No formula could serve as a substitute, in this area, for judgment and restraint[,]" Justice Harlan continued:

It is this outlook which has led the Court continuingly to perceive distinctions in the imperative character of Constitutional provisions, since that character must be discerned from a particular provision's *larger context.* And inasmuch as this context is *not one of words, but of history and purposes,* the full scope of the liberty guaranteed by the Due Process Clause cannot be found in or limited by the precise terms of the specific guarantees elsewhere provided in the Constitution.

*Poe,* 367 U.S. at 543, 81 S.Ct. at 1777 (Harlan, J., dissenting on jurisdictional grounds) (emphasis added). This omitted quote highlights Justice Harlan's approach, employed by the *Casey* Court, of using history and tradition in general, not the written Constitution, to delimit the Fourteenth Amendment. *See also Griswold,* 381 U.S. at 501, 85 S.Ct. at 1691 (Harlan, J., concurring) (rejecting Justice Douglas's restriction of substantive due process to the Bill of Rights and suggesting that judicial restraint may be achieved in the Fourteenth Amendment context "only by continual insistence

upon respect for the teachings of history, solid recognition of the basic values that underlie our society, and wise appreciation of the great roles that the doctrines of federalism and separation of powers have played in establishing and preserving American freedoms.").

The Court is no longer interpreting the words of the Constitution;  after *Casey* it is interpreting history.  Words such as "rational continuum," "substantial arbitrary impositions," "purposeless restraints," and "balance ... which our Nation has struck" are code words intended to evoke emotional and rhetorical fealty, yet they have no meaning independent of that given them by five Justices.  The people's Constitution—at least as to unenumerated constitutional rights—has become the Court's Constitution.  Those principles most conducive to the people's happiness now come not from the people, but from Platonic guardians.  Justice Black has been proven right, arguing in his dissent in *Griswold* against such an ambitious use of the Due Process Clause:  "For myself it would be most irksome to be ruled by a bevy of Platonic Guardians, even if I knew how to choose them, which I assuredly do not."  *Griswold,* 381 U.S. at 526-27, 85 S.Ct. at 1705 (Black, J., dissenting) (quoting Learned Hand, *The Bill of Rights* 70 (1958)).

As the Supreme Court said in *Bowers v. Hardwick,* "The Court is most vulnerable and comes nearest to illegitimacy when it deals with judge-made constitutional law having little or no cognizable roots in the language or design of the Constitution."  478 U.S. 186, 194, 106 S.Ct. 2841, 2846, 92 L.Ed.2d 140 (1986).  Interestingly, the Court does not even conduct such a historical review in *Casey* to bolster *Roe* 's "doctrinal footing," nor does it accept or refer to the history cited in *Roe* as compelling.  *See Casey,* 505 U.S. at 849-50, 112 S.Ct. at 2806.

B

In part because of the Supreme Court's ambiguity about the scope of substantive due process, it is unclear to me that the Court itself still believes that abortion is a "fundamental right" under the Fourteenth Amendment.  In the narrow context of this concurrence, I will not canvas the Supreme Court's entire line of abortion cases.  For the purposes of this opinion, it is necessary only to point out that the Court's more recent decisions indicate tepid support for *Roe v. Wade.* If *Roe* is no longer the best interpretation of the Constitution, then our authority to strike the Louisiana statute is very

tenuous.

In *Planned Parenthood v. Casey,* the Court in a fractured joint opinion upheld *Roe* 's "central holding," but did not defend *Roe* as a sound reading of the Constitution. 505 U.S. at 860-61, 112 S.Ct. at 2812. Instead, it upheld *Roe* out of concerns for the abstract, nonconstitutional value of *stare decisis,* for the institutional credibility of the Court, and because of the primacy of settled expectations about constitutional law. *Id.* ("Within the bounds of normal *stare decisis* analysis, then, and subject to the considerations on which it customarily turns, the stronger argument is for affirming *Roe* 's central holding, with whatever degree of personal reluctance any of us may have....").

The joint opinion in *Casey* was correct to consider the force of precedent and the value of settled expectations. However, I think that the Court would have been more in line with the Constitution had it given effect to its conclusion that *Roe* is wrong. Where the Constitution is the source of a court's power, it must interpret the Constitution first and consider institutional credibility second. Where, for example, the Court finds that it does not have the *constitutional* authority to strike a state law, its own prior opinions (especially erroneous ones) do not grant that authority, *stare decisis* notwithstanding.

The *Casey* Court asserted that it should not overrule cases, especially cases such as *Roe,* lightly. It explained: "a decision to overrule should rest on some special reason over and above the belief that a prior case was wrongly decided." *Casey,* 505 U.S. at 864, 112 S.Ct. at 2813, (citing *Mitchell v. W.T. Grant Co.,* 416 U.S. 600, 636, 94 S.Ct. 1895, 1914, 40 L.Ed.2d 406 (1974) (Stewart, J., dissenting)); *Mapp v. Ohio,* 367 U.S. 643, 677, 81 S.Ct. 1684, 1703, 6 L.Ed.2d 1081 (1961) (Harlan, J., dissenting). But these dissents do not impress upon me why the Supreme Court (or any Article III court) should derive the authority to evaluate state laws under its own precedents and not under the best reading of the Constitution. What more should the Court need in order to overrule a prior case than its studied conclusion, based on the words of the Constitution, that the case had been wrongly decided?

*Roe* and its progeny, including *Bellotti II,* have always stood on precarious constitutional footing for the reasons I indicated in the last section. After *Casey,* these cases may not even be

constitutional law. They might best be considered vestigial precedents propped up only by the judicial creation of *stare decisis.*

II

Perhaps because of the difficulties of restricting substantive due process, the Supreme Court assumed what can only be called legislative duties in *Bellotti v. Baird,* 443 U.S. 622, 99 S.Ct. 3035, 61 L.Ed.2d 797 (1979) ("*Bellotti II* "). In *Bellotti II,* the Supreme Court addressed the constitutionality of a Massachusetts statute restricting minors' access to abortion. The *Bellotti II* Court held that minors have the same abortion rights as women who have reached the age of majority, and that the Massachusetts's parental consent law unduly burdened minors' exercise of that right. *Bellotti II,* 443 U.S. at 647, 99 S.Ct. at 3050. But the Court did not stop there. It continued, stating that the Court's interpretation of the word "liberty" in the Fourteenth Amendment required that, when states seek to regulate minors' access to abortions,

> every minor must have the opportunity—if she so desires—to go directly to a court without first consulting or notifying her parents. If she satisfies the court that she is mature and well enough informed to make intelligently the abortion decision on her own, the court must authorize her to act without parental consultation or consent. If she fails to satisfy the court that she is competent to make this decision independently, she must be permitted to show that an abortion nevertheless would be in her best interests. If the court is persuaded that it is, the court must authorize the abortion.

*Id.* at 647-48, 99 S.Ct. at 3050. The Court thus decided that a minor seeking an abortion without parental consent must be afforded a prompt hearing in court; must be allowed to have an abortion if the court decides she is mature enough to make the decision herself; and must be allowed to proceed if the court determines an abortion is in her best interests. *Id.* Regardless of whether that is good policy, I am not confident that there is a principled way to reach that conclusion from the word "liberty" in the Fourteenth Amendment. By promulgating specific, minimum requirements for state parental consent statutes despite a complete vacuum of Constitutional authority, the Court's opinion in *Bellotti II* has the distinct flavor of judicial legislation.

*Bellotti II* addresses policy concerns with parental consent statutes, elevates those concerns to constitutional heights, then declares Massachusetts's nonconforming policy decisions to be unconstitutional. This line of reasoning amounts to little more than a tautology. By positing a

fundamental right to abortion and by classifying regulations that jurists deem unwise as an "undue burden" on that right, federal judges risk constitutionalizing their policy preferences regarding any of the catalogue of substantive Fourteenth Amendment rights.

As one might expect, such backward induction yields conflicting and seemingly arbitrary results. For example, we are instructed in *Bellotti II* that parental consent requirements are unconstitutional, 443 U.S. at 649-50, 99 S.Ct. at 3051, yet in *Casey* we are told that the Constitution does not invalidate informed consent requirements, 505 U.S. at 887, 112 S.Ct. at 2826. In *Akron I,* we learn that women have a fundamental right to an abortion that prohibits states from imposing a twenty-four hour waiting period, *Akron v. Akron Center for Reprod. Health,* 462 U.S. 416, 450, 103 S.Ct. 2481, 2503, 76 L.Ed.2d 687 (1983), while in *Casey* we learn that "liberty" does not prohibit such a twenty-four hour waiting period, 505 U.S. at 885, 112 S.Ct. at 2824 (overruling *Akron I* ). The Court's different opinions about the best way to administer a "fundamental right" to abortion may be sensible; on the other hand they may not. But in any event they are not driven by the Constitution.

As illustrated by *Bellotti II,* the due process clause has become a blank check, redeemable for whatever rights the courts fashion. This is no rule of law, and it is certainly not constitutionalism. The Supreme Court's abortion jurisprudence assures us that our panel has authority under the Constitution to strike portions of Louisiana's parental consent statute. But because this jurisprudence no longer derives its force from the written Constitution, I hesitate to invoke *Bellotti II* to strike this law.

III

Aside from serious concerns about substantive due process, I have a pragmatic objection to courts substituting their judgments about this type of policy question for the decisions of legislatures. As I have asserted before, I think that the modern abortion cases are less about policy than about power. *Sojourner T. v. Edwards,* 974 F.2d 27, 31 (Garza, J., concurring specially) (quoting *Casey,* 505 U.S. at 981, 112 S.Ct. at 2874 (Scalia, J., dissenting in part)). The last two sections have outlined my belief that the Constitution has vested the power to decide these hotly contested, nonconstitutional issues in the state legislatures. *See* U.S. Const. amend. IX and X. In addition to

my beliefs about the constitutional authority of Article III courts, I also think that these issues are better decided over time by democratic, political institutions. *See generally* Cass R. Sunstein, *Foreword: Leaving Things Undecided,* 110 Harv. L.Rev. 4 (1996) (arguing for narrow judicial decisions in cases involving constitutional and moral uncertainty).

The Supreme Court's abortion jurisprudence epitomizes a trend toward centralizing and constitutionalizing the most controversial issues of public policy. I believe that expanding the jurisdiction and power of the courts in order to speed the pace of change is unjustified. Where the Constitution does not dictate otherwise, the proper mode of political reform is through enlightened debate, political experimentation, and change. We are a pluralistic nation with strong individualist ideals. One large component of American civic virtue is public debate over issues. To be sure, this requires patience, because self-determination is not a guarantee of correctness the first time or every time. State legislatures will occasionally pass "silly" laws. *See, e.g., Griswold,* 381 U.S. at 527, 85 S.Ct. at 1705 (Stewart, J., dissenting). Some states may be slower than others in coming to what may eventually be a national consensus on an issue. But the ideal is that, through public discourse and experimentation, states will reconsider anachronistic laws, adapt, change, and find the public policies that work best. Where these issues are not constitutional, it demeans the ideal of democracy for the courts to decide these issues for the people, especially under a strained interpretation of the Constitution.

Some have justified an ambitious judicial role in abortion cases by suggesting that the Supreme Court has a special calling to unite the nation in high-stakes cases in which people passionately disagree. In *Casey,* the Court stated that such cases carry a special "dimension" that places those opinions in a class by themselves:

> Where, in the performance of its judicial duties, the Court decides a case in such a way as to resolve the sort of intensely divisive controversy reflected in *Roe* and those rare, comparable cases, its decision has a dimension that the resolution of the normal case does not carry. It is the dimension present whenever the Court's interpretation of the Constitution calls the contending sides of a national controversy to end their national division by accepting a common mandate rooted in the Constitution.

*Casey,* 505 U.S. at 866-67, 112 S.Ct. at 2815. The Court suggested that the two cases exemplifying this call to a common mandate were *Roe v. Wade* and *Brown v. Board of Education.* But as Justice

Scalia pointed out in his *Casey* dissent, *Roe* did not settle the political issue of legalized abortion. No one accepted a common mandate in that case. In retrospect, it is clear that the Supreme Court's intervention in the debate clouded the issues, inflaming those who believe that there is no constitutional right to abortion and forcing advocates of legalized abortion to defend abortion "rights" under *Roe.* Today we see that even many of those who believe that abortion should be legal do not support *Roe v. Wade* as faithful interpretation of the Constitution. *See Casey,* 505 U.S. at 860-61, 112 S.Ct. at 2812 (joint opinion reluctantly upholding *Roe* on *stare decisis* grounds); *see also* Ruth Bader Ginsburg, *Some Thoughts on Autonomy and Equality in Relation to* Roe v. Wade, 63 N.C. L.Rev. 375, 385-86 (1985) (criticizing the "[h]eavy handed judicial intervention" of the *Roe* court and suggesting an alternative starting point for analysis in abortion cases).

*Roe* did not mark the end of the debate or the acceptance of a common mandate, but the beginning of a bitter national exegesis. In this respect, *Roe* is more like *Plessy v. Ferguson,* 163 U.S. 537, 16 S.Ct. 1138, 41 L.Ed. 256 (1896), than *Brown v. Board of Education,* 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954) (*Brown I* ). *Plessy,* like *Roe,* represented an attempt to read into the Constitution one view of history and social policy neither explicit nor fairly implied from the Constitutional text. "Separate but equal" may have been an attempt to solve a contentious issue of the 1890s, but it was not constitutional interpretation. *Plessy* did not unite the nation behind the idea that segregation was consistent with the Civil War Amendments. As in its abortion cases, the Court occasionally upheld the "central holding" of *Plessy* on *stare decisis* grounds, before finally overruling it in *Brown I,* 347 U.S. at 494-95, 74 S.Ct. at 691-92. I suggest this comparison not necessarily to draw any moral parallel between slavery and abortion, but rather to point out that the Court's insertion of itself as the final arbiter of the abortion debate is unlikely to prove more successful than its attempt in *Plessy.*

*Plessy* is not the only time our nation has faced a conflict between faithful interpretation and *stare decisis.* We learned the same lesson about ambitious judicial intervention again in the early twentieth century, even in the same substantive due process context, in the line of cases following *Lochner v. New York,* 198 U.S. 45, 25 S.Ct. 539, 49 L.Ed. 937 (1905). In *Lochner* and its progeny,

the Court established and upheld on *stare decisis* grounds the *laissez-faire* notion that state regulation of worker health and welfare violated the substantive due process rights of employers in liberty of contract. See, *e.g., Adkins v. Children's Hospital of District of Columbia,* 261 U.S. 525, 43 S.Ct. 394, 67 L.Ed. 785 (1923). The Court later overruled *Adkins* and signaled the end of the *Lochner* era in *West Coast Hotel Co. v. Parrish,* 300 U.S. 379, 57 S.Ct. 578, 81 L.Ed. 703 (1937), holding that the Due Process Clause did not contain implicit protections of absolute liberty of contract.

In fact, the very first substantive due process case tel ls the same story. In *Dred Scott v. Sanford,* 60 U.S. (How.) 393, 450, 15 L.Ed. 691 (1856), the Court held, among other things, that a slave owner did not lose his property interest in the slave when he traveled with the slave to a free state. In what could be described as the beginning of substantive due process, the Court held that a section of the Missouri Compromise, which would have recognized such slaves as free, was unconstitutional. The Court held that such governmental intrusion on private property rights, regardless of procedural safeguards, "could hardly be dignified with the name of due process of law." *Id.* This was the first time since *Marbury v. Madison* that the Court used the power of judicial review, and the first time ever t hat the Court invalidated a statute under judicial review. That a notion as controversial as substantive due process sprang from such a cataclysmic opinion is revealing.

*Dred Scott* was fashioned as an opinion to put an end to a bitter dispute in America. It took one of the most contentious and personal of political issues out of the national debate. But instead of resolving controversies, *Dred Scott* tore the nation apart. Although *Roe* and its progeny have not resulted in a civil war, the peace over abortion since 1973 has been anything but civil. The last twenty years have seen political protest over the Court's abortion jurisprudence unmatched by any other political issue of our day. Protest marches, clinic bombings, and fatal shootings have punctuated the debate. Putting the lid on this pot has caused it to boil over. Regular debate, lobbying, and legislation at the state level, as contemplated by the Constitution, may diffuse political pressure, relieve tensions, and provide for nuanced answers to hard questions about abortion. Removing such issues from the people prevents their vetting at the local level and requires the political pressure to be released outside the bounds of civil debate.

In *Dred Scott, Plessy,* and *Lochner,* the Court made things worse by inserting itself into, and preempting, the national debate. Although at one time these cases were also defensible on *stare decisis* grounds, they are not celebrated cases in our history. By contrast, the cases in which the Court overruled such precedents, such as *Brown I* and *West Coast Hotel,* are celebrated as constitutional moments. It is of course easier to discern between the two types of cases in retrospect. I think that enough history has passed for us confidently to conclude that *Roe* belongs in the former category, cases in which the Court intervened to settle a national debate by way of expansive constitutional interpretation. It remains for our Supreme Court to write the analog to *West Coast Hotel* extricating itself from the substantive due process morass of abortion cases and returning the debate to the people.

Deliberation about this subject, although heated, is healthy. As a nation, we have not reached a consensus about when life begins; we have not finally determined the proper interplay between a mother's liberty, the interests of an unborn child, and the state's interests in protecting life. At an ontological level, we the people have yet to decide whether person defines life or life defines person. As technology allows fetal independence at an earlier and earlier age, our understanding of these questions will not remain static. The Constitution, in all its prescience, does not answer these questions. Such ontic questions are quintessentially the right of the people to decide. In abortion cases, law presupposes a theory of ethics and morality, which in turn presupposes deeply personal ideas about being and existence. Our answers to such questions as when life begins define our ethical beliefs, and these ethical beliefs should determine how we govern ourselves. It is a serious mistake to try to reverse this order, to make our law determine how we decide these fundamental, personal, ontic issues. Abortion in this context is less a question about constitutional law, and more about who we are as a people. I submit that this is a decision the Supreme Court cannot make. Liberty is not coextensive with license; it therefore must have limits. Those limits may be imposed only by the people, either in their Constitution or through their laws, not legislated by the courts. Taking these issues out of the public discourse threatens to foment hostility, stifle the search for answers, distance people from their Constitution, and undermine the credibility of that document.

# IV

*Bellotti II* represents a type of legislating that is better left to Congress or the states.  In many cases, the courts must fill in gaps in statutes, account for unforeseen circumstances, or decide difficult issues that legislators avoid.  However, in this instance, Louisiana actually *did* exercise its legislative powers;  it debated and struggled and made tough choices.  Now we are nullifying Louisiana's choice, not under the Constitution, but under *Roe* 's continuing authority based on *stare decisis.*

Therefore it is not impertinence that makes me question the Supreme Court's abortion jurisprudence, but institutional modesty.  I am uncomfortable invoking the authority of the Constitution to invalidate this statute, especially under such an ambiguous mandate from the Constitution.  Although the Court said in *Bellotti II* that *Roe* and the Fourteenth Amendment set minimum standards for parental consent statutes, it is unclear that the post-*Casey* Supreme Court still believes that the Constitution demands this outcome.  Overturning Louisiana's legislature on such thin authority runs dangerously close to anticonstitutional hubris.  As Abraham Lincoln said of *Dred Scott:*

> The candid citizen must confess that if the policy of the government, upon vital questions affecting the whole people, is to be irrevocably fixed by decisions of the Supreme Court, the instant they are made, in ordinary litigation between parties in personal actions, the people will have ceased to be their own rulers, having, to that extent, practically resigned the government into the hands of that eminent tribunal.

Abraham Lincoln, *First Inaugural Address—Final Text* (Mar. 4, 1861), *in* 4 *The Collected Works of Abraham Lincoln* 262, 268 (Roy P. Basler ed., 1953) (cited in *Casey,* 505 U.S. at 996, 112 S.Ct. at 2882 (Scalia, J., dissenting in part)).